UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

TODD FORSBERG,

                    Petitioner,

    v.

WILLIAM GITTERE, *et al.*,

                    Respondents.

Case No. 3:19-cv-00037-MMD-CLB

ORDER

## I.   SUMMARY

Petitioner Todd Forsberg ("Forsberg") was sentenced in Nevada state court to, *inter alia*, two consecutive life sentences without the possibility of parole after being found guilty by a jury of first-degree murder with use of a deadly weapon. (ECF Nos. 22-5, 22-7 at 22, 22-8.) Forsberg filed a counseled amended petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 10 ("Petition")). Respondents have answered . (ECF No. 34.[1]) This matter is before the Court for adjudication on the merits of the grounds in Forsberg's Petition. For the reasons discussed below, the Court denies Forsberg's Petition and a certificate of appealability.

## II.   BACKGROUND

On April 23, 2009, a jury found Forsberg guilty of first-degree murder with a deadly weapon. (ECF No. 22-5.) [2]  The victim was Forsberg's acquaintance, whose body a paleobiologist discovered in the Bonham Ranch area, near Pyramid Lake, north of Reno,

---

[1]Forsberg filed a reply in support of the petition. (ECF No. 37.)

[2]Exhibits referenced in this order are exhibits to Respondents' motion to dismiss, (ECF No. 16), and are found at ECF Nos. 17-25.

Nevada. The discovery of the victim's body occurred four years after the victim was last seen. (ECF Nos. 10 at 2-3, 20-1 at 140-145.) The state district court sentenced Forsberg to two consecutive terms of life in prison without the possibility of parole. (ECF No. 22-7 at 22.) Judgment of conviction was entered on July 2, 2009. (ECF No. 22-8.) Forsberg appealed his judgment of conviction, and the Nevada Supreme Court affirmed on July 15, 2010. Forsberg sought state postconviction relief. (ECF No. 22-36.) The state district court denied relief, and the Nevada Supreme Court affirmed on October 11, 2018. (ECF Nos. 22-33, 25-15.)

Forsberg dispatched his initial federal habeas petition for filing on or about January 10, 2019. (ECF No. 4.) The Court granted his motion for appointment of counsel. (ECF No. 3.) Forsberg then filed this Petition. (ECF No. 10.)

## III.   LEGAL STANDARDS

### A.  AEDPA Standard of Review

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court."

2

*Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

To the extent that the petitioner challenges the state court's factual findings, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *See, e.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id*. The governing standard is not satisfied by a mere showing that the state court finding was "clearly erroneous." *Lambert*, 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

///

.... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

## B. Ineffective Assistance of Counsel

Federal courts address ineffective assistance of counsel ("IAC") claims under the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney "made errors so serious that he or she was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment," and (2) "that the deficient performance prejudiced the defense." *Williams*, 529 U.S. at 3991 (quoting *Strickland*, 466 U.S. at 687)). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id*. at 391 (citation and internal quotation marks omitted). To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. (citation and internal quotation marks omitted). A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id*. (citation and internal quotation marks omitted). Additionally, any review of the attorney's performance must be "highly deferential" and must adopt "counsel's perspective at the time" of the challenged conduct to avoid "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id*.

4

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotation marks and citations omitted). When the IAC claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an IAC claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*.

The United States Supreme Court has described federal review of a state supreme court's decision on an IAC claim as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The Supreme Court emphasized that it "take[s] a highly deferential look at counsel's performance . . . through the deferential lens of § 2254(d)." *Id.* (citations and internal quotation marks omitted). Moreover, federal habeas review of an IAC claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding IAC claims:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*. at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 123. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 124. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any

1   reasonable argument that counsel satisfied *Strickland's* deferential
    standard.

2

3   *Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of

4   counsel must apply a strong presumption that counsel's representation was within the

5   wide range of reasonable professional assistance." *Id*. at 104 (citations and internal

6   quotation marks omitted). "The question is whether an attorney's representation

7   amounted to incompetence under prevailing professional norms, not whether it deviated

8   from best practices or most common custom." *Id*. (internal quotation marks and citations

9   omitted).

10  **IV.    TRIAL TESTIMONY**

11          The only other alleged witness to Nathan Byrns's death was Karl Czekus.[3] (ECF

12  Nos. 19-1 at 190-203; 20-1 at 1-63.) Czekus testified that in July 2003 Forsberg told

13  Czekus that he had given Byrns $200 for drugs, and Byrns had failed to provide the drugs

14  or return the money. According to Czekus, he and Byrns drove to Forsberg's home in

15  Fernley, then drove in Forsberg's Chevrolet Blazer beyond Pyramid Lake out on dirt roads

16  to an abandoned ranch. (ECF No. 19-1 at 197-198.) They stopped close to dark; Czekus

17  then left the group to urinate. (*Id*. at 199-200.) When Czekus turned around, Forsberg

18  had a pistol pointed at Byrns. (*Id*. at 200.) Forsberg asked Byrns if he had Forsberg's

19  money or drugs. (*Id*.) According to Czekus, Byrns told Forsberg that "the drugs weren't

20  any good" and that he was embarrassed to tell Forsberg. (*Id*. at 201.) Forsberg said,

21  "That's too bad. Your embarrassment is going to cost you your life." (ECF No. 19-1 at

22  202.) Forsberg then fired the first shot and missed Byrns. (*Id*.) The second shot hit Byrns

23  in the forearm, and the next two shots hit Byrns in the torso. (*Id*.) Byrns fell to the ground

24  and said, "Oh, fuck. I'm dead." (ECF No. 20-1 at 1.) Forsberg replied, "No, not yet you're

25          [3]The Court makes no credibility findings or other factual findings regarding the truth
26  or falsity of evidence or statements of fact in the state court record. The Court summarizes
    the same solely as background to the issues presented in this case, and it does not
27  summarize all such material. No assertion of fact made in describing statements,
    testimony, or other evidence in the state court constitutes a finding by this Court. Any
28  absence of mention of a specific piece of evidence or category of evidence does not mean
    the Court overlooked it in considering Forsberg's claims.

not," and then shot Byrns in the head. (*Id*.) Czekus and Forsberg moved the body into one of the outbuildings and then drove back to Fernley. (*Id.* at 2.) Czekus never saw the gun again. (*Id.* at 3.) Forsberg instructed Czekus to help cover this up and said that if Czekus ever said anything he "could end up like [Byrns] did." (*Id.*) Within a few days, Forsberg and Czekus returned to the abandoned ranch at nighttime. (*Id.* at 4-5.) The two men wrapped Byrns's body in a tarp and a blanket and then tied it with rope. (*Id.* at 5.) They dragged Byrns's body into dense brush under a tree and covered it up with brush and old boards. (*Id.* at 5-6.) Czekus never went to the police because he was afraid of Forsberg. (*Id.* at 7-8.)

On cross-examination, Czekus acknowledged that the first time the police interviewed him, more than four years after the incident, he said he had no idea what had happened to Byrns. (*Id.* at 12.) Czekus had introduced Byrns and Byrns's girlfriend Sherri Herron to Forsberg to facilitate a drug deal. (*Id.* at 13-14.) About a month later, police interviewed Czekus a second time. (*Id.* at 15-16.) Czekus reviewed his second statement and agreed that he told police he had not seen Forsberg pull the trigger, but he told the grand jury that he had seen Forsberg pull the trigger. (*Id.* at 21-22.) Forsberg's defense counsel Scott Edwards then questioned Czekus about inconsistencies between his statement to police and subsequent testimony, including whether he knew where Byrns's body was, what parts of Byrns's body had been shot, and what type of gun was used. (*Id.* at 23-26.) Czekus said that he thought Forsberg was going to beat up Byrns and leave him at the abandoned ranch, which Czekus thought was a fair consequence for taking $200 from Forsberg. (*Id.* at 35-36.) Czekus had not planned to take part in the beating. (*Id.* at 37-38.) According to Czekus, the police never promised Czekus that they would not prosecute him for his involvement. (*Id.* at 39.) Within a day or so after the shooting, Sherri Herron guessed what had happened and Czekus did not deny it.(*Id.* at 42-43.) Czekus testified that, between his first and second police interviews, he learned that Forsberg had been incarcerated. (*Id.* at 46.) He felt more comfortable being forthcoming with police in the second interview. (*Id.* at 47.)

Sherri Herron recalled that Forsberg had told her in July 2003 that he wanted his money from Byrns. (*Id.* at 66-94.) A couple of days later, Forsberg and Czekus came to Herron's house to pick up Byrns. (*Id.* at 69.) Later that day, Forsberg and Czekus returned. (*Id.* at 72-73.) Herron asked Forsberg and Czekus where Byrns was, and they said that Byrns "had been taken care of" and that she was to ask no more questions. (*Id.* at 74.) Herron interpreted that to mean that Byrns had been killed. (*Id.* at 75.) She never saw Byrns again. (*Id.*) Herron was afraid of Forsberg, so she did not go to the police. (*Id.*) On cross-examination, Herron acknowledged that during her first police interview she only told the police that she knew Byrns. (*Id.* at 83.) During the second interview, Herron maintained that she did not know where Byrns was or what had happened to him. (*Id.* at 84-85.)

Pamela Mooney learned in late summer or early fall of 2003 that Byrns was missing. (*Id.* at 95-109.) Mooney recalled that on October 14, 2003, Forsberg told her that he "had taken care of [Byrns] or made him disappear." (*Id.* at 97-98.) Mooney took that to mean that Forsberg had killed Byrns. (*Id.* at 98.) Mooney asked Forsberg why he had killed Byrns, and Forsberg responded that "it was over a drug debt." (*Id.* at 99.) Mooney stated that she was, and still is, close friends with Czekus. (*Id.* at 106.) Czekus's girlfriend Ruby told Mooney that Czekus had taken Ruby to the location where they had left Byrns's body. (*Id.* at 107.) Mooney also acknowledged that around February 2007 Czekus told her that if a detective contacts her, she should say the last time she saw Byrns was when he was getting on a bus and leaving town. (*Id.*)

Karen Tucker then testified that Forsberg drove an older Chevy Blazer back in 2003. (*Id.* at 110-111.) Tucker said that sometime around summer 2003 she asked Forsberg if it was true that he had killed Byrns over a small amount of money, and he responded, "Hell, yeah." (*Id.* at 114.) Tucker had had no further contact with Forsberg and had not gone to the police "[f]or the simple fact if [Forsberg] could kill Nathan [Byrns] over a hundred bucks, who's to say he couldn't do it to [Tucker]?" (*Id.* at 115.) Years later,

1   when Forsberg was taken into custody and charged with murder, Tucker felt more

2   comfortable telling police what she knew. (*Id.* at 116.)

3        Leslie Mowery testified that she and Forsberg began dating in 2000 and moved to

4   Fernley together in 2001. (*Id.* at 121-122.) They broke up in October 2004. (*Id.* at 122.)

5   Once in 2003, as Mowery recalls, Forsberg was standing by the kitchen sink when he

6   started to become upset. (*Id.* at 123-124.) Forsberg was crying and told Mowery that he

7   had shot someone in the head and killed him over a drug deal gone wrong. (*Id.* at 124.)

8   A couple weeks later, Mowery raised the subject when they were visiting a friend's house.

9   (*Id.* at 125.) Forsberg got very angry. (*Id.*)  Mowery was afraid that, if she went to the

10  police, Forsberg would kill or gravely injure her. (*Id.* at 126.) According to Mowery,

11  Forsberg had a .357 Magnum revolver that they both used for target practice. (*Id.* at 126-

12  127.) Forsberg kept the gun in his Chevy Blazer. (*Id.* at 127.) On cross-examination,

13  Mowery acknowledged that she thought Forsberg was referring to a different person when

14  he told her he had killed someone (*Id.* at 130.) Mowery did not know that Forsberg had

15  been arrested until an investigator for the prosecution contacted her in March 2009. (*Id.*

16  at 134.)

17       Dean Kaumans, deputy sheriff and forensic investigator for the Washoe County

18  Sheriff's Office, testified that he was called to Bonham Ranch in August 2007 to

19  investigate a possible human bone. (*Id.* at 153-154.) Kaumans found what he thought

20  was a human femur bone. (*Id.* at 155.) Searching further, Kaumans and other deputies

21  located a white plastic tarp in some large bushes. (*Id.* at 155, 157.) The tarp was covered

22  with wood planks and dead foliage. (*Id.* at 158.) When Kaumans pulled the tarp out from

23  the bushes, he cut into it and saw a human skull and teeth. (*Id.* at 159.) At that point,

24  Kaumans called the coroner. (*Id.* at 159-160.) Kaumans, a qualified fingerprint examiner,

25  found no fingerprints, weapon, or spent projectiles. (*Id.* at 181-182.)

26       Jeff Rolands, criminalist for the Washoe County Sheriff's Office Crime Lab, testified

27  that he could not detect DNA on most of the remains or the blanket or tarp in which they

28

1    were found. (*Id.* at 200-201.) Rolands identified the skeleton as Byrns's by comparing

2    DNA found on Byrns's teeth with a saliva sample from Byrns' father. (*Id.* at 199-200.)

3         Forensic pathologist Ellen Clark conducted the autopsy. (ECF No. 21-1 at 7-42.)

4    She concluded that Byrns died of at least three gunshot wounds to the head and torso.

5    (*Id.* at 27.) In particular, Clark identified a gunshot wound entering around the right eye

6    with an exit wound at the back of the head, and another gunshot wound entering the front,

7    upper body and exiting the left scapula. (*Id.* at 12-14.) Forensic anthropologist Katherine

8    Taylor testified that she had also examined the skeleton and had identified three gunshot

9    wounds. (*Id.* at 82-85, 88.) Taylor said there was no doubt whatsoever in her mind that

10    the injuries were caused by gunshot. (*Id.* at 91.)

11         Joe Bowen, a deputy for Washoe County Sheriff's Office, was the lead detective

12    for the investigation and testified that the wallet found on the body contained numerous

13    cards—including casino gaming cards—that bore the name Nathan Byrns. (*Id.* at 43-46.)

14    He interviewed Forsberg in November 2007 (*Id.* at 92-93.). Forsberg first denied

15    recognizing a photograph of Byrns. (*Id.* at 97.) Eventually, Forsberg admitted he gave

16    $200 to Byrns to buy drugs and conceded that Byrns never gave Forsberg the drugs or

17    returned the money. (*Id.* at 98.) According to Forsberg, Czekus had some work for Byrns

18    to do to pay off the debt. (*Id.* at 99-100.) Forsberg told Bowen that, on the date of the

19    alleged murder, Forsberg, Czekus, and Byrns drove to a Native American reservation

20    near Pyramid Lake in Forsberg's Blazer. (*Id.* at 100-101.) However, Forsberg did not

21    provide Bowen any further information. (*Id.* at 101-102.)

22    **V.**     **INSTANT PETITION**

23       **A. Ground 1**

24         Forsberg contends that his trial counsel Scott Edwards was ineffective in violation

25    of his Sixth and Fourteenth Amendment rights. (ECF No. 10 at 10-20.)  Forsberg includes

26    five subparts to this ground.

27    ///

28    ///

### 1.  Ground 1.1

Forsberg argues that trial counsel failed to offer an accomplice testimony jury instruction at trial. (*Id*. at 11-12.) Forsberg asserts that there was no corroboration of Czekus's testimony regarding Byrns's death; the only corroborated fact was that a drug deal between Forsberg and Byrns had gone wrong. Forsberg insists that, because trial counsel failed to preserve the issue on direct appeal, the state appellate court reviewed the issue "under a patently prejudicial standard." (*Id*. at 11.) Forsberg contends that if trial counsel Edwards had sought the jury instruction, there is a reasonable probability that the state trial court would have given it, which would have raised concerns about Czekus's credibility. (*Id*. at 12.)

In Nevada, an accomplice is "one who is liable to prosecution, for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." NRS § 175.291(2). The trial court must give a cautionary jury instruction when an accomplice's testimony is uncorroborated. *Howard v. State*, 729 P.2d 1341, 1344 (Nev. 1986). "If the testimony is corroborated, a cautionary instruction is favored, but failure to grant it is not reversible error." *Gonzalez v. State*, 366 P.3d 680, 686 (Nev. 2015).

Czekus was never charged in this case. No evidence showed that Czekus had known in advance that Forsberg planned to kill Byrns. On direct appeal, Forsberg argued that the state failed to present sufficient evidence to corroborate Czekus's testimony. (ECF No. 22-28 at 9-13.) The Nevada Supreme Court noted that Forsberg failed to request an appropriate jury instruction and observed:

> We note, however, that the other evidence adduced at trial—including four witnesses who related Forsberg's statements that he had "made [the victim] disappear" and had "taken care" of him—was sufficiently corroborative of Czekus' testimony to satisfy NRS 175.291(1) even if Czekus had been treated as an accomplice. *See Evans v. State*, 113 Nev. 885, 891-92, 944 P.2d 253, 257 (1997) (discussing the standard for corroborating evidence); *Orfield v. State*, 105 Nev. 107, 108-09, 771 P.2d 148, 149 (1989) (explaining which witnesses may properly be considered accomplices). We therefore discern no prejudice.

1    (ECF No. 22-33 at 2-3.)

2        At the evidentiary hearing on Forsberg's state postconviction petition, defense counsel

3    Edwards testified that he had looked into whether Czekus was an accomplice. (ECF No.

4    24-1 at 63.) After this investigation, Edwards viewed Czekus more as a "dirty companion,"

5    not as a "true accomplice with the same state of mind as alleged." (*Id*.) Aside from

6    Czekus's credibility, Edwards did not think that Czekus's potential accomplice role helped

7    Forsberg's case. Edwards had sought to cast doubt on Czekus's motivation and veracity

8    by eliciting testimony at trial that Czekus had later returned to the scene of the crime. (*Id*.

9    at 66.) Edwards agreed that the defense theory had been that Czekus committed the

10   murder, not Forsberg, or alternatively that the state had not proven Forsberg's guilt

11   beyond a reasonable doubt. Thus, Edwards did not want to present a theory that Forsberg

12   and Czekus were accomplices.

13       The Nevada Supreme Court ultimately held that Forsberg did not establish that his

14   trial counsel's trial strategy was unsound:

15           Forsberg first argues that trial counsel should have requested a jury
16       instruction on the credibility of accomplice testimony to preserve a better
         standard of review on appeal. The district court found that trial counsel
17       made a strategic decision not to request such an instruction based on trial
         counsel's testimony that the defense theory was that the purported
18       accomplice was the actual killer. Forsberg has not shown extraordinary
         circumstances warranting a challenge to counsel's strategic decision. *See*
19       *Lara v. State*, 120 Nev. 177, 180, 87 P.3d 528, 530 (2004) ("[T]rial counsel's
         strategic or tactical decisions will be virtually unchallengeable absent
20       extraordinary circumstances." (internal quotation marks omitted)). Insofar
         as Forsberg argues that preserving this issue would have led to a more
21       favorable standard of appellate review, it is the law of the case that the trial
         evidence sufficiently corroborated the relevant testimony, such that
22       Forsberg was not prejudiced by review under a plain error, rather than
         harmless error standard. *See Forsberg v. State*, Docket No. 54223 (Order
23       of Affirmance, July 15, 2010); *Valdez v. State*, 124 Nev. 1172, 1190, 196
         P.3d 465, 477 (2008) (distinguishing plain error and harmless error
24       standards of review); *Hall v. State*, 91 Nev. 314, 315, 535 P.2d 797, 798
         (1975) (discussing law-of-the-case doctrine). The district court therefore did
25       not err in denying this claim
26

27   (ECF No. 25-15 at 3.)

28   ///

In his Petition, Forsberg claims that Czekus's testimony that Forsberg killed Byrns was uncorroborated. (ECF No. 10 at 11.) But Pamela Mooney testified that Forsberg told her he had either "taken care of [Byrns] or made him disappear" over a drug deal. (ECF No. 20-1 at 97-98.) Karen Tucker testified that when she asked Forsberg if he had killed Byrns, Fornsberg said "yes" and agreed that it had been over a small amount of money. (*Id.* at 114.) Forsberg's girlfriend of four years testified that she had come upon him crying in their kitchen one day and he had said he had shot a man. (*Id.* at 124.) Moreover, Edwards noted that if he had argued that Czekus was an accomplice, he would then have to concede that Forsberg worked in concert with Czekus. (ECF No. 24-1 at 65.) All this testimony flatly contradicted Edwards' defense theory that Czekus had committed the murder. Forsberg thus fails to demonstrate that the Nevada Supreme Court's decision was contrary to, or involved an unreasonable application of, *Strickland*. *See* 28 U.S.C. § 2254(d).

### 2.  Ground 1.2

Next, Forsberg contends that trial counsel failed to sufficiently investigate potential witnesses who reportedly saw the victim alive after the date of the alleged murder. (ECF No. 10 at 13-15.) Forsberg argues that, because multiple witnesses claimed to have seen Byrns, Edwards should have investigated further to raise reasonable doubt in a case with no forensic evidence linking Forsberg to Byrns' death. (*Id.* at 14.)

At the state postconviction evidentiary hearing, Detective Bowen testified that, to his recollection, more than two people had said that they had seen Byrns after July 2003. (ECF No. 24-1 at 26.) Bowen could not prove or disprove those statements. (*Id.*)

Edwards testified at the postconviction hearing that he had read the statements that had been given to law enforcement. (*Id.* at 54-55.) As Edwards recalled, he had tried to locate the individuals who had claimed to have seen Byrns after July 2003. (*Id.* at 55, 85.) Edwards said he eventually concluded, for various reasons, that these individuals had been mistaken. (*Id.* at 55.) Forsberg had been involved in his own defense and extremely familiar with the discovery, and he had given Edwards no information on how to locate

1 these people. (*Id.* at 85-86.) No one had said definitively they had seen Byrns at a later
2 date. (*Id.* at 87-90.) Forsberg's state postconviction counsel pressed Edwards as to why
3 he did nothing more to locate the people who had claimed to have seen Byrns after 2003.
4 (*Id.* at 85-87.) Edwards responded that a significant amount of time had passed, the
5 supposed witnesses had been heavily involved in drugs, and he did not think they would
6 have been credible. (*Id.* at 55.) And based on his review of the statements and evidence
7 in the case, Edwards believed these individuals had been mistaken. (*Id.* at 55, 86.)
8 Edwards also mentioned that witnesses favorable to the prosecution had emerged close
9 to trial, including Forsberg's girlfriend, who said Forsberg had confessed to her that he
10 had shot a man. (ECF Nos. 20-1 at 134, 24-1 at 112.)

11     The Nevada Supreme Court concluded that Fosberg's trial counsel's professional
12 judgment regarding these potential witnesses was not unreasonable:

> Forsberg next argues that trial counsel should have investigated certain
> witnesses who purportedly saw the victim alive after the date on which the
> State alleged he was killed. The district court found that trial counsel made
> reasonable efforts to investigate the alleged sightings and that the
> investigating detective could not verify any of the sightings. Substantial
> evidence supports those findings. Based on those findings and trial
> counsel's testimony that he could not find the individuals who allegedly saw
> the victim and considered the allegations suspicious, Forsberg has not
> shown deficient performance. *See Strickland*, 466 U.S. at 690-91
> (explaining that tactical decisions made after an incomplete investigation
> are reasonable insofar as professional judgment supports the limited
> investigation and that counsel's failure to pursue investigations may not be
> challenged as unreasonable where counsel has reason to believe that the
> investigation is fruitless). Further, Forsberg has not shown that further
> investigation would have rendered a more favorable outcome reasonably
> probable and thus has not shown prejudice. *See Molina v. State*, 120 Nev.
> 185, 192, 87 P.3d 533, 538 (2004).

23 (ECF No. 25-15 at 3-4.)

24     Law enforcement could not confirm the witnesses' claims that they saw Byrns after
25 July 2003. (ECF No. 24-1 at 26.) Edwards tried unsuccessfully to locate at least one of
26 the witnesses. (*Id.* at 55, 85.) Having reviewed the evidence, Edwards concluded that
27 anyone who had claimed to have seen Byrns after July 2003 had been mistaken. (*Id.* at

55, 86.) Considering the passage of time, the feasibility of finding these witnesses and their potential credibility problems, the Court cannot conclude that Edwards proceeded unreasonably. (*Id.* at 55.) Thus, Forsberg fails to demonstrate that the Nevada Supreme Court's decision was contrary to, or involved an unreasonable application of, *Strickland*. *See* 28 U.S.C. § 2254(d).

### 3.  Ground 1.3

Forsberg argues that trial counsel was ineffective for failing to object to a prosecutor's statement during voir dire and failing to dismiss a juror who was a former classmate of the victim. (ECF No. 10 at 15-17.)

The prosecutor asked during voir dire whether any prospective juror had religious or moral positions that would prevent or affect their ability to participate on a jury. (ECF No. 19-1 at 87.) The prosecutor then had the following exchange with prospective juror Gabriel Harrison, who had answered the question affirmatively:

Prosecutor: Tell me about that.

Prospective Juror: I just -- I don't think that a man can judge another man. Look at the margin of error that there is in some outcomes. I just would have a hard time.

Prosecutor: And is that based upon a religious factor or just a personal preference?

Prospective Juror: Personal preference.

Prosecutor: So it's not just a matter of this particular case. You might have that problem on any criminal case?

Prospective Juror: Just take that stance in life, period. I don't see how I can. You hear about somebody being put to death or have them spend the majority of their life in prison, find out they're not guilty. I have a hard time thinking about that.

Prosecutor: You're talking about some cases of The Innocence Project where there were some people found innocent after — even after being executed; is that correct?

Prospective Juror: Correct.

Prosecutor: A high number of people. I can assure you that has not happened in Washoe County. It has not happened as far as I'm aware of in Northern Nevada. Absolutely positive it has not happened in Washoe County. So it's just more of your personal viewpoint, not so much religious reasons; correct?

Prospective Juror: Correct.

Prosecutor: So you would have -- to go back to my earlier question, you would probably have the same predicament if you were seated on another murder trial, let's say a sexual-assault trial in three or four weeks, you would have the same issue as someone uncomfortable for you to judge your fellow man?

Prospective Juror: Well, I'd say you'd have to have physical evidence. What's presented isn't all the evidence. Or say that everything that could be presented isn't presented, and the defendant ends up in prison for a period of time just because of things were not presented because of -- I just -- it's hard to explain, but I don't see how a person could judge a person in that sense or in the current –

Prosecutor: I think I've heard enough. Your Honor, I would challenge [Prospective Juror] for cause.

(*Id.* at 88-89.)

Edwards testified at the state postconviction hearing that he had not objected to the prosecutor's statement about wrongful convictions never happening in Washoe County because he had believed the prosecutor to be correct. (ECF No. 24-1 at 92-93.) Edwards explained that he had done capital litigation and said he was not aware of any instances in Northern Nevada where a person was found to be innocent after they had been executed. (*Id.* at 93.) Edwards did not interpret the prosecutor as claiming that the state never prosecutes innocent people. (*Id.*)

The state district court found that the "statement was inappropriate and contrary to the presumption of innocence." (ECF No. 25-4 at 15.) The district court found that Edwards had been deficient in failing to object, but that Forsberg could not demonstrate *Strickland* prejudice. (*Id.* at 22-23.) The Nevada Supreme Court, however, agreed with Edwards's assessment of the prosecutor's statement:

///

1

2          Forsberg next argues that trial counsel should have objected to the
   prosecutor's statement during voir dire regarding whether anyone in
3  Washoe County had been exonerated after being executed.[FN2] The
   district court concluded that the statement was analogous to asserting that
4  the State does not prosecute innocent people and therefore trial counsel
   should have objected. Considering the statement in context, we disagree.
5  A prospective juror—who was not ultimately impaneled—expressed
   reticence about judging other people because some condemned inmates
6  have been exonerated after serving lengthy sentences. The prosecutor
   asked if the prospective juror was referring to the Innocence Project and
7  mentioned that no one in Washoe County had been exonerated after having
   been executed. In doing so, the prosecutor did not imply that the State only
8  charges guilty people, but rather commented on exonerations of individuals
   who had been found guilty beyond a reasonable doubt. As Forsberg has
9  not shown that the prosecutor's comment undermined the presumption of
   innocence, *see* NRS 175.191 (providing that a defendant is presumed
10 innocent until the contrary is proved), he has not shown that counsel's
   failure to object was objectively unreasonable. *See Ennis v. State*, 122 Nev.
11 694, 706, 137 P.3d 1095, 1103 (2006). The district court did not err in
   denying this claim. *See Wyatt v. State*, 86 Nev. 294, 298, 468 P.2d 338,
12 341 (1970) ("If a judgment or order of a trial court reaches the right result,
   although it is based on an incorrect ground, the judgment or order will be
   affirmed on appeal.").

13         [FN2: Trial counsel testified that he did not challenge this statement
14 because he did not believe it to be factually inaccurate.]

15 (ECF No. 25-15 at 4-5.)

16     Billy Brown, the prospective juror who had known the victim, indicated that he went to

17 high school with Byrns but was not close friends with him. (ECF No. 19-1 at 103-104.)

18 Brown said he had known who Byrns was in high school but had never talked to him back

19 then. (*Id.* at 103.) Nevertheless, Brown assured the prosecutor that he could base his

20 verdict solely on the evidence presented. (*Id.*)

21     Edwards recalled at Forsberg's state postconviction hearing that he was concerned

22 that even just knowing who the victim was might lead Brown to view Forsberg unfavorably.

23 (ECF No. 24-1 at 70.) Edwards had asked Forsberg if he wanted to strike Brown, but

24 Forsberg had told Edwards he liked Brown and wanted Edwards to keep him on the jury.

25 (*Id.*)

26     The Nevada Supreme Court held that Forsberg did not present a valid basis to

27 challenge Edwards's decision, noting that the prospective juror did not know the victim

28 well:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

Forsberg next argues that trial counsel should have used a peremptory challenge to remove a prospective juror who had been the victim's high-school classmate, contending that counsel abdicated his responsibility by seeking Forsberg's input. The prospective juror, who was ultimately impaneled, testified that he did not know the victim well or consider the victim a friend and that he could be impartial. Trial counsel testified that because he was not concerned about the juror's impartiality but thought that the juror may have sympathy for the victim, counsel asked Forsberg his preference and that Forsberg stated that he wanted the prospective juror on the jury. As trial counsel determined that the prospective juror's impartiality was not at issue and nothing compelled trial counsel to use a peremptory strike on an impartial juror, Forsberg has not shown extraordinary circumstances justifying a challenge to counsel's decision not to peremptorily strike the prospective juror and thus has not shown that trial counsel performed deficiently. *See Wesley v. State*, 112 Nev. 503, 511, 916 P.2d 793, 799 (1996) (concluding that a defendant cannot show prejudice if the impaneled jury is impartial); *Oliver v. State*, 85 Nev. 418, 423, 456 P.2d 431, 434 (1969) (observing that peremptory strikes need not be supported by any particular reason); *see also United States v. Fontenot*, 14 F.3d 1364, 1370 (9th Cir. 1994) (suggesting that a defendant's interest in being present during voir dire is the opportunity to participate by sharing his opinions with counsel); *People v. Sloan*, 592 N.E.2d 784, 787 (N.Y. 1992) (discussing the value of a defendant's observations with respect to counsel's decision whether to challenge a juror for cause or by peremptory strike).

16  (ECF No. 25-15 at 5-6.)

17  As to either prospective juror, Forsberg has not demonstrated deficiency or prejudice

18  under *Strickland*. *See Strickland*, 466 U.S. at 687. The first prospective juror, Gabriel

19  Harrison, was not impaneled. Moreover, the exchange between Harrison and the

20  prosecutor centered around Harrison's qualms over judging another person in general.

21  As to prospective juror Billy Brown, Forsberg does not show that Edwards had been

22  deficient in not using a challenge to dismiss Brown. Edwards testified at the state

23  postconviction hearing that Forsberg had been intelligent and actively involved in his

24  case. (ECF No. 24-1 at 85-86.) Forsberg himself had wanted to keep Brown on the jury,

25  and while Edwards had some concerns, he did not have a strong professional opinion

26  that Brown must be dismissed. (*Id.* at 70.) Even assuming that Edwards should have used

27  a peremptory challenge to dismiss Brown, Forsberg cannot show that the jury would have

28  decided differently, especially in light of the evidence presented at trial. Accordingly,

1  Forsberg fails to show that the Nevada Supreme Court's decision was contrary to, or
2  involved an unreasonable application of, *Strickland*. *See* 28 U.S.C. § 2254(d).

3  ### 4. Ground 1.4

4  Forsberg asserts that trial counsel was ineffective for failing to retain a forensic
5  pathologist to testify at trial. (ECF No. 10 at 17-19.) Forsberg argues that no bullets, bullet
6  casings, or weapon were ever found, and another forensic pathologist could have created
7  reasonable doubt about the prosecution's version of events. (*Id.* at 19.)

8  Forsberg called forensic pathologist Terri Haddix to testify at the evidentiary hearing
9  on his state postconviction petition. (ECF No. 24-1 at 127-184.) Haddix testified that,
10  based on her prior experience, the way Byrns's body was wrapped and concealed
11  suggested that the death had occurred elsewhere and that the body had been later
12  transported and deposited within the brush. (*Id.* at 155.) As support, Haddix explained
13  that the items wrapped around the body were not natural to the area and that the body
14  had been wrapped "to facilitate movement of the body." (*Id.* at 156, 158.) Haddix had
15  completed a report for Forsberg's trial and acknowledged that in the report she had not
16  suggested the possibility that the death had occurred elsewhere and subsequent
17  transport of the body. (*Id.* at 159.) Haddix stated that it was possible that gunshot-residue
18  analysis could have been conducted on the clothing or wrappings. (*Id.* at 172.) Haddix
19  acknowledged that she could not rule out the possibility that the killing of Byrns and
20  concealment of his body had occurred the way Czekus testified to at trial. (*Id.* at 182-83.)
21  Haddix also stated that she agreed in large part with the forensic conclusions the state
22  presented at trial. (*Id.*)

23  Edwards explained at the postconviction evidentiary hearing that he had lacked any
24  basis to challenge the forensic pathology report. (*Id.* at 93-96.) Edwards did not want to
25  present another expert who would agree with the state's forensic conclusions. (*Id.* at 93-
26  94.) The Nevada Supreme Court rejected this claim, noting that Haddix had been unable
27  to disprove the state's evidence and witness testimony:
28  ///

1
2
3
4
5
6
7
8

      Forsberg next argues that trial counsel should have retained a forensic pathologist. Trial counsel testified that he did not believe that retaining a defense expert would have been helpful because he did not identify any issues regarding the time or cause of death reported by the State's expert. Decisions regarding what witnesses to call are tactical decisions that rest with counsel, *Rhyne v. State*, 118 Nev. 1, 8, 38 P.3d 163, 167 (2002), and Forsberg has not shown extraordinary circumstances warranting a challenge to the decision at issue here. Further, Forsberg has not shown prejudice, as the forensic pathologist who testified at the evidentiary hearing posited an alternative theory that the victim was killed at a different site and dumped at the abandoned ranch where the body was ultimately found, but could not rebut the State's expert's conclusions or the witness testimony that the victim was shot and his body wrapped and moved within the site in the course of hiding the body at the abandoned ranch.

9

10 (ECF No. 25-15 at 6.)

11     A petitioner must show how the failure to call witnesses might have changed the

12 outcome at trial. *See United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987).

13 Forsberg's contention that testimony such as that proffered by Haddix would have created

14 reasonable doubt lacks merit. Haddix testified that she had investigated deaths where

15 further evidence showed that the person had been killed elsewhere and transported to

16 the site where the body had been discovered. (ECF No. 24-1 at 155.) Haddix stated that

17 there was a probability that the same had happened with Byrns. (*Id.* at 157-158.) As

18 support, Haddix explained that no bullets, bullet casings, or weapons had been recovered

19 and that Byrns's body had been wrapped with materials not native to the site. (*Id.* at 155-

20 156.) Czekus testified that, shortly after Forsberg had shot Byrns, Czekus and Forsberg

21 had returned to the site of the crime to wrap and conceal Byrns's body with the tarp,

22 blanket, and rope. (ECF No. 20-1 at 4-6.) Nothing in Haddix's testimony contradicted that

23 of Czekus. For these reasons, Forsberg fails to show that the Nevada Supreme Court's

24 decision was contrary to, or involved an unreasonable application of, *Strickland*. *See* 28

25 U.S.C. § 2254(d).

26                     **5.  Ground 1.5**

27     Finally, Forsberg argues that counsel was ineffective for failing to question lead

28 detective Joe Bowen about the lack of forensic evidence linking Forsberg to the crime.

1   (ECF No. 10 at 19-20.) Bowen had told the grand jury that no forensic evidence linked

2   Forsberg to Byrns's death. (ECF No. 17-5 at 98-99.)

3       Edwards had cross-examined forensic examiner Ellen Clark. (ECF No. 21-1 at 32-41.)

4   Edwards elicited testimony that Clark had not been able to determine what caliber bullet

5   had caused the injuries or when Byrns's death had occurred, and that no bullet fragments

6   had been recovered. (*Id*. at 35-38.) Edwards had highlighted the lack of physical evidence

7   during closing argument. (*Id*. at 162-175.)

8       The Nevada Supreme Court concluded that Forsberg presented no basis to challenge

9   how Edwards had questioned Bowen:

10          Forsberg next argues that trial counsel should have asked the
11      investigating detective whether any physical evidence linked Forsberg to
        the killing. Decisions regarding how to question witnesses are tactical
12      decisions, *id*., and Forsberg has not shown extraordinary circumstances
        warranting a challenge to counsel's decisions regarding cross-examination,
13      particularly where counsel addressed in closing argument the lack of
        physical evidence linking Forsberg to the murder. The district court
14      therefore did not err in denying this claim.

15

16  (ECF No. 25-15 at 7.)

17      Counsel's decisions about the extent of cross-examination and whether to refrain from

18  certain lines of inquiry are entitled to great deference. *Dows v. Wood*, 211 F.3d 480, 487

19  (9th Cir. 2000); *see also Brown v. Uttecht*, 530 F.3d 1031, 1036 (9th Cir. 2008). Forsberg's

20  claim lacks merit. Edwards had cross-examined the testifying forensic examiner. (ECF

21  No. 21-1 at 32-41.) Forsberg does not show what would have been gained by having lead

22  detective Bowen also state what the forensic evidence had demonstrated and had failed

23  to demonstrate. Forsberg fails to show that the Nevada Supreme Court's decision was

24  contrary to, or involved an unreasonable application of, *Strickland*. *See* 28 U.S.C. §

25  2254(d).

26      Accordingly, the Court denies federal habeas relief as to ground 1.

27  ///

28  ///

**B. Ground 2**

Forsberg urges that he suffered prejudice due to the cumulative effect of his trial counsel's errors. (ECF No. 10 at 20-21.)

The cumulative effect of multiple errors can violate due process and warrant habeas relief where the errors have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007). Here, the Nevada Supreme Court held that Forsberg had not pointed to any trial counsel errors to cumulate:

> Lastly, Forsberg argues that cumulative error warrants relief. Even if multiple instances of deficient performance may be cumulated for purposes of demonstrating prejudice, *see McConnell v. State*, 125 Nev. 243, 259 & n.17, 212 P.3d 307, 318 & n.17 (2009), Forsberg has not identified any instances of deficient performance to cumulate. The district court therefore did not err in denying this claim.

(ECF No. 25-15 at 7.)

Forsberg does not establish that Edwards performed deficiently. Forsberg fails to demonstrate that the Nevada Supreme Court's decision on federal ground 2 was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).  Accordingly, ground 2 is denied.

Forsberg's Petition, therefore, is denied in its entirety.

**VI.    CERTIFICATE OF APPEALABILITY**

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims

rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id*.

Having reviewed its determinations and rulings in adjudicating Forsberg's petition, the Court finds that none of those rulings meets the *Slack* standard. The Court therefore declines to issue a certificate of appealability for its resolution of Forsberg's petition. Applying these standards, the Court finds that a certificate of appealability is unwarranted.

## VII.    CONCLUSION

It is therefore ordered that Petitioner Forsberg's counseled amended petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 10) is denied.

It is further ordered that a certificate of appealability is denied.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 30th Day of September 2022.

_____
MIRANDA M. DU,
UNITED STATES DISTRICT JUDGE